IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| KENNISHA PRINCE, ET AL.<br><br>Plaintiffs<br><br>v.<br><br>HOSPITAL HIMA SAN PABLO CAGUAS, ET AL.<br><br>Defendants | CIVIL NO. 12-1221 (PG) |

**OPINION AND ORDER**

This is a diversity action concerning the death of a premature baby born at Hospital HIMA San Pablo Caguas ("HIMA"). The baby's mother, father and grandmother initiated this medical malpractice suit against the hospital, the attending physician and the insurers seeking more than three million dollars in damages for the defendants' alleged negligence in the treatment of the deceased infant.

Following plaintiffs' voluntary dismissal of the action as to the attending physician, Dr. Jesus Alvarez Perez, HIMA filed a Motion for Summary Judgment (Docket No. 53) that is presently before this Court. Plaintiffs filed their Response in Opposition (Docket No. 58) and accompanying Statement of Uncontested Facts (Docket No. 57), followed by defendants' Reply (Docket No. 69).

It is plaintiffs' position that defendants deviated from the standards of medical care in the medical treatment provided to K'Marr Prince Mingo after he was born and while he was interned at HIMA's neonatal intensive care unit. See Docket No. 1. Plaintiffs contend that HIMA's negligence caused the premature and untimely death of K'Marr Prince Mingo. Id.

HIMA refutes their theory and asks us to enter Summary Judgment in their favor alleging that Puerto Rico law recognizes a presumption of correctness of medical treatment which plaintiffs have not rebutted. See Docket No. 53 at page 24.

After close examination of the record and the applicable statutory and case law, the Court DENIES HIMA's Motion for Summary Judgment for the reasons explained below.

I.     BACKGROUND

Plaintiffs filed this action on March 28, 2012 following the passing of baby K'Marr Prince Mingo. See Docket No. 1. In the Complaint, plaintiffs claim that during his hospitalization at HIMA, K'Marr sustained two infections which were negligently managed by the hospital's medical and nursing staff. See Docket No. 1 at ¶35. The Complaint avers that Dr. Jesus Alvarez Perez—who treated plaintiff Kennisha Prince upon her arrival at HIMA—was liable for his own negligence and that the Hospital was liable both vicariously (for Dr. Alvarez's carelessness) and by virtue of its independent negligence. See Docket No. 1 at ¶¶43-44.

Both the doctor and the Hospital denied these claims. See Dockets No. 33 and 36. The defendants raised the presumption of correctness in medical treatment that Puerto Rico law recognizes and affirmed that Ms. Kennisha Prince and her baby received the degree of care that a reasonable and prudent hospital and physician should provide. Id. HIMA also stated that, in any case, hospitals in Puerto Rico are only liable for the negligence of their employees, technical or nursing staff and that the doctors who treated Ms. Prince have never been employees of HIMA. See Docket No. 36 at ¶¶16-17.

On July 11, 2013 plaintiffs filed a motion to dismiss with prejudice their claims against co-defendant Dr. Jesus Alvarez Perez and his conjugal partnership. See Docket No. 41. During the period of pretrial discovery, plaintiffs retained neonatologist Dr. Carolyn Crawford as an expert. In her expert report, Dr. Crawford renders her conclusion that a series of mistakes on HIMA's part ultimately led to the death of K'Marr. See Docket No. 53-1. Following the completion of discovery, HIMA moved for summary judgment arguing that the plaintiffs had failed to show a basis for any liability, vicarious or direct, on its part. See Docket No. 53.

II.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment is governed by Rule 56(c) Fed. R. Civ. P., which allows disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Sands v. Ridefilm Corp., 212 F.3d 657, 660 (1st Cir.2000). A factual dispute is "genuine" if it could be resolved in favor of either party and "material" if it potentially affects the outcome of the case. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir.2004).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome or determinative fact in the record, DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir.1997), through definite and competent evidence. See Maldonado-Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir.1994). Once the movant has averred that there is an absence of evidence to support the

non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. See Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990) (citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. See Suarez v. Pueblo Int'l, 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). However, "summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." See Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990).

At the summary judgment juncture, the court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. See Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir.2002). The court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000). This is so, because credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id.

### III.     FACTUAL FINDINGS

#### A.  Stipulated Facts

The parties stipulated the following facts in their Joint Proposed Pretrial Order (Docket No. 56) and thus, the Court adopts them:

1. Plaintiffs Kennisha Prince and Norma Prince are residents of St. Thomas, U.S. Virgin Islands ("U.S.V.I.")
2. Plaintiff Jamaal Mingo is a resident of St. Croix, U.S.V.I.
3. Plaintiff Kennisha Prince was the mother of K'Marr Prince Mingo.
4. Plaintiff Jamaal Mingo was the father of K'Marr Prince Mingo.
5. Plaintiff Norma Prince was the grandmother of K'Marr Prince Mingo and is the mother of Kennisha Prince.
6. Defendant Centro Medico del Turabo Inc. d/b/a HIMA San Pablo Caguas is the owner and operator of a hospital of the same name, located in Caguas, Puerto Rico.
7. Plaintiff Kennisha Prince was under the prenatal care of Dr. Ronald Nimmo, her obstetrician and gynecologist in St. Thomas, U.S.V.I.

8. Plaintiff Kennisha Prince sought medical attention at the Roy Lester Schneider Hospital in St. Thomas, U.S.V.I, on February 22, 2011 during the 28th week of her pregnancy.

9. Plaintiff Kennisha Prince was examined at the Roy Lester Schneider Hospital by Dr. Nimmo on February 22, 2011.

10. Plaintiff Kennisha Prince, per Dr. Ronald Nimmo's orders, was transferred and airlifted from Roy Lester Schneider Hospital to HIMA on February 22, 2011 with an intrauterine pregnancy of 28 weeks, prolonged premature rupture of membranes, severe oligohydramnios, intrauterine growth restriction and pregnancy-induced hypertension.

11. Plaintiff Kennisha Prince arrived and was admitted to HIMA on February 23, 2011.

12. On February 27, 2011 Ms. Prince gave birth to baby K'Marr Mingo at approximately 28 weeks gestation.

13. Baby K'Marr was born vaginally on February 27, 2011, following augmentation of labor because of variable decelerations and decreased variability of the fetal heart rate.

14. Baby K'Marr was born weighing 2 lbs 1 ounce, measuring 13 and-a-half inches in length and with a head circumference of 10 inches.

15. Baby K'Marr was admitted to the Intensive Care Unit immediately upon birth on February 27, 2011.

16. The course of baby K'Marr's condition was complicated by recurring apnea, sepsis, cholestasis and anemia.

17. On March 9, 2011, baby K'Marr was placed on nasal CPAP because of recurrent apnea. He was treated with Vancomycin and Fortaz for suspected sepsis.

18. Blood cultures of March 11, 2011 confirmed sepsis due to staphylococcus epidermis ("staph epi").

19. Blood cultures taken on March 15, 2011 and reported on March 17 showed no growth of staph epi.

20. Antibiotics were discontinued on March 19, 2011 after completion of a ten-day course.

21. The patient subsequently developed another episode of sepsis due to a different organism, which was later confirmed to be enterobacter cloacae.

22. Blood cultures taken on March 22, 2011 and reported on March 24 confirmed sepsis due to enterobacter cloacae.

23. According to the record, blood cultures eventually became negative on March 26, 2011.

24. Baby K'Marr Prince Mingo eventually died on March 29, 2011 at HIMA San Pablo Caguas.

B. **Additional Findings of Facts**

In addition, after careful review, the Court makes the following factual findings:

25. Kennisha Prince lives with her mother, Norma Prince, two siblings and her son at her mother's apartment in St. Thomas. See Docket No. 52-1 at page 14, lines 12, 24 and page 15, lines 1- 7.

26. Jamaal Mingo is a resident of St. Croix, U.S.V.I., where he lives with his mother and two siblings. See Docket No. 52-3 at page 10, lines 16-24 and page 12, lines 13-24.

27. Jamaal Mingo has a total of five children that live with their respective mothers in St. Croix, St. Thomas and the continental United States. See Docket No. 52-3 at page 43, lines 18-24; pages 44-56.

28. At the time of the events that give rise to the Complaint, Kennisha Prince was 22 years old. See Docket No. 52-4 (Indicating that Ms. Prince's Date of Birth is "7/8/88").

29. Before giving birth prematurely to baby K'Marr, Kennisha Prince had three prior pregnancy losses. According to the medical records from the Roy Lester Schneider Medical center, two of Ms. Prince's pregnancies resulted in induced terminations of pregnancy in the years 2004 and 2006 and a third was a miscarriage or spontaneous abortion in the year 2009. See Docket No. 52-4 at page 1-A.

30. Kennisha Prince's pregnancy with baby K'Marr was a complicated pregnancy due to hypertension and fetal growth restriction. See Docket No. 52-5 at page 2.

31. Kennisha Prince suffered premature rupture of membranes at approximately 28 weeks gestation. See Docket No. 52-5 at page 2.

32. Upon her arrival and admission into HIMA on February 23, 2011, Kennisha Prince was placed under the care of Dr. Jesus Alvarez. See Docket No. 52-5 at pages 1-2.

33. Kennisha Prince's medical records at HIMA indicate in a Multidisciplinary Note that, on 2/23/2011 at 5:30 P.M., she was explained the neonatal complications associated with her pregnancy. See Docket No. 52-8 at page 101A.

34. Baby K'Marr was identified as SGA or small for gestational age baby. See Expert Report of Dr. Carolyn Crawford, Docket 53-1 at page 2; Docket No. 52-7 at page 489.

35. Dr. Carolyn Crawford stated in her deposition that staph epi infection one of the most common causes of infection in very low birth weight babies in intensive care units. See Docket No. 58-2 at page 36, lines 1-3.

36. According to the Progress Notes on HIMA's medical records, on 3/12/2011 at 12:00 p.m. K'Marr was being treated with Vancomycin and Fortaz. Furthermore, in the section named

"Plan" there is a note stating the following: "Pt completing treatment due bacteremia under close observation." See Docket No. 52-7 at pages 472-472a.

37. On March 21, 2011, when sepsis was suspected, K'marr was started on broad spectrum antibiotics. He was treated with Amikin (one dose) on March 21 and Imipenem starting on March 21; Zyvox (Linezolid) was added on March 22; and on March 24, the antibiotics were changed to Gentamicin and Cefepime.[1]

38. A blood culture taken on March 26, 2011 indicates the following: "BTA PF Bottle: Neg to Date." See Docket No. 52-7 at page 602.

39. Dr. Carolyn Crawford admits that consulting physicians only make recommendations and it is within the treating physician's discretion which recommendation to implement. See Docket No. 53-13 at page 48, lines 4-24.

40. The medical record reflects that a consultation to an infectious disease consultant was placed on March 23 at 8:30 am.[2]

41. The record shows that by 8:30 am on March 24, 2011 the consultation had been answered and the recommendations of the infectologist implemented.[3]

42. Dr. Carolyn Crawford recognized that very low weight babies like baby K'Marr are complicated patients that are prone to suffering multiple episodes of sepsis and face complex medical problems, one of the most important and potentially lethal complications being sepsis occurring after 72 hours of birth.[4] In pertinent part, Dr. Crawford testified the following:

```
 6.      Q.   Will you be in agreement with the                 P.57
 7            following statement: The risk of sepsis increases
 8            with decreasing birth weight and gestational age.
 9       A.   I agree.
10       Q.   Infants with lowest birth weights are more
11            likely to have multiple episodes of sepsis. Agree
12                or disagree?
13       A.   Well, there's a trend in that direction. . ,
14            That does depends, however, on the care given. You
```

---

[1] The plaintiffs admit this fact in their "Response in Opposition to Defendants Statement of Uncontested Facts." See Docket No. 57 at ¶22.
[2] The plaintiffs admit this fact in their "Response in Opposition to Defendants Statement of Uncontested Facts." See Docket No. 57 at ¶28.
[3] The plaintiffs admit this fact in their "Response in Opposition to Defendants Statement of Uncontested Facts." See Docket No. 57 at ¶29.

[4] The plaintiffs admit to this portion of HIMA's proposed fact in their "Response in Opposition to Defendants Statement of Uncontested Facts." See Docket No. 57 at ¶31.

| | | | |
|---|---|---|---|
| 15 | | know his infections were what are called | |
| 16 | | "nosocomial." In other words, they are infections | |
| 17 | | that are acquired in the nursery. | |
| 18 | Q. | **Doctor, do you agree or disagree with** | |
| 19 | | **that**? | |
| 20 | A. | *I agree*. | |
| . . . | | | |
| 24 | Q. | **How much did this baby weigh when he was** | |
| 25 | | **born**? | |
| 1 | A. | *think around a thousand grams*. | P.58 |
| 2 | Q. | **That's a very low-weight baby or what?** | |
| 3 | A. | If you're -- | |
| 4 | Q. | I think it was described like that on the | |
| 5 | | record. | |
| 6 | A. | *Right. Very low birth weight*. | |
| 7 | Q. | **He [K'maar] would be a very low-weight baby**? | |
| 8 | A. | *Yes*. | |
| 9 | Q. | He was born at 28 weeks? 26, 28 weeks? | |
| 10 | A. | 28 weeks, I think. | |
| 11 | Q. | **Will you agree with the following** | |
| 12 | | **statement**: Most very low weight neonates have | |
| 13 | | complex medical problems and prolonged | |
| 14 | | hospitalizations. | |
| 15 | A. | **Probably change that to many, not most**. I | |
| 16 | | don't think it's most at 28 weeks, but many of them | |
| 17 | | do. | |
| 18 | Q. | **Will you agree that late onset sepsis is** | |
| 19 | | **defined as sepsis occurring after 72 hours after** | |
| 20 | | **birth remains an important and potentially lethal** | |
| 21 | | **complication on very low birth weight infants?** | |
| 22 | **A.** | *I agree*. | |

See Docket No. 53-13 at page 56, line 6-page 58, line 22.

43. Dr. Crawford agreed with the following statement in her deposition: "Physicians who are treating a neonate who has documented bacteremia and central venous access face a difficult decision regarding the removal of the catheter, [as the] catheter often is vital to patient support, yet it may be a persistent source of organisms that cannot be treated adequately in situ." See Docket No. 53-13 at page 60, lines 5-14.

**IV.    DISCUSSION**

HIMA's request for summary judgment rests on the alleged contradictions between Dr. Crawford's expert report and her deposition testimony. Citing to different portions of Ms. Crawford's testimony as well as excerpts from Ms. Kennisha Prince's and K'Marr Mingo's medical records, HIMA

argues that the plaintiffs have not made a prima facie showing of negligence on HIMA's part to rebut the presumption of correctness of medical treatment that Puerto Rico law recognizes.

According to HIMA, Dr. Crawford's own statements support their view that K'Marr's life was so compromised because of the complications inherently associated with premature, very low weight babies, that his death cannot be attributed to any particular action or omission on HIMA's part. The plaintiffs put forward a diametrically different perspective, arguing that Dr. Crawford gives weight to their theory of the case regarding HIMA's departure from the relevant standard of care.

Because this is a diversity suit, the substantive law of Puerto Rico controls. See Marcano Rivera v. Turado Med. Ctr., 415 F.3d 162, 167 (1st Cir.2005). In Puerto Rico, in order to prevail on a medical malpractice claim, "a party must establish (1) the duty owed; (2) an act or omission transgressing that duty; and (3) a sufficient causal nexus between the breach and the harm." Id. Puerto Rico law holds physicians to a national standard of care "[B]ecause Puerto Rico law presumes that physicians exercise reasonable care, a plaintiff bent on establishing a breach of a physician's duty of care ordinarily must adduce expert testimony to limn the minimum acceptable standard and confirm the defendant doctor's failure to meet it." See Rojas-Ithier v. Sociedad Española de Auxilio Mutuo y Beneficiencia de Puerto Rico, 394 F.3d 40, 43 (1st Cir. 2005) (citing Cortes-Irizarry v. Corporacion Insular De Seguros, 111 F.3d 184, 190 (1st Cir. 1997)). To prevail in a medical malpractice suit, "[a] plaintiff must prove, by a preponderance of the evidence, that the physician's negligent conduct was the factor that 'most probably' caused harm to the plaintiff." See Lama v. Borras, 16 F.3d 473, 478 (1st Cir. 1994) (citing Sierra Perez v. United States, 779 F.Supp. 637, 643 (D.P.R.1991)).

To give context to HIMA's assertions, we first address the conclusions rendered by Dr. Crawford on her expert report. Dr. Crawford attributes baby K'Marr's death to a sequence of errors in his treatment, traceable to the hospital, its physicians and staff.  In particular, the expert mentions the following negligent acts and omissions: (i) "a delay in the request and response of the Infectious Disease Consultant;" (ii) failure to remove an infected catheter even though, "given K'Marr's test results and his overall condition…the removal of his infected catheter was mandatory;" (iii) the need to consult a hematologist "because of plummeting platelet values despite frequent platelet transfusions" and (iv) an "inappropriate initial antibiotic selection" which lead to persistent septicemia. See Dockets No. 53-1 and 58-24.

Analyzed against the backdrop of the causation standard, we find that triable issues of fact exist as to the question of what caused the death of baby K'Marr. Let us discuss each of the alleged deviations from the standard of care that Dr. Crawford pinpoints and defendants refute.

**(i)    The Staph Epi Infection**

It is an uncontested fact that on March 11, 2014 a blood culture taken from baby K'Marr tested positive to staph epi. Dr. Crawford's report indicates that the staph epi was a "nosocomially acquired infection related to probable breakdowns in sterile technique and problematic nursing care" (Docket No. 53-1 at page 4), thus suggesting negligence on the part of the hospital. Defendants counter that Dr. Crawford admitted in her deposition testimony that staph epi "is one of the most common causes of infection in very low birth weight babies in intensive care units." See Docket No. 58-2 at page 36, lines 1-3.

With that single remark, HIMA purports to establish that there are no factual controversies regarding the origin of the staph epi infection, even though, a few lines below, Dr. Crawford qualified her seemingly categorical statement. When prompted to expand on her previous averment, Dr. Crawford testified that defining staph epi as a "common infection" depends on what "nursery you're talking about." She added: "[i]t's really possible to dramatically reduce the incidents of staph epi sepsis by being very fastidious and careful about central lines and invasive procedures and handwashing and glove---using gloves and so on." See Docket No. 58-2, page 36 at lines 4-10.

To decide that summary judgment is warranted would require that the court weigh the evidence and decide whether to give more weight to Dr. Crawford's expert report or to a particular portion of her deposition. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. See Reeves, 530 U.S. at 135. We thus decline the invitation.

The parties also differ in their framing of another material fact, whether the infection was treated in a manner that complies with the recognized standard of care. HIMA states that the staph epi was "successfully treated" because the blood labs taken after treatment was commenced had negative results. See Docket 53 at page 10. Although the plaintiffs can hardly negate the results of the blood cultures, they aver that the initial antibiotic selection to treat the staph epi infection was inappropriate, a choice that triggered a series of effects that led to "persistent septicemia." See Docket No. 53-1 at page 6.

Once more, the Court is asked to weigh the evidence and draw inferences that are best left to a jury. Can it be concluded that the infection was "successfully treated" because it was contained by antibiotics or was the treatment itself inefficacious? It is not up to the Court to answer that question at this stage.

### (ii) The Infectious Disease Consultation

It is Dr. Crawford's opinion that, given K'Marr's condition, there was a delay in requesting an Infectious Disease Consult and a delayed response from the consultant. To establish that Dr. Crawford's conclusion stems from an inaccurate premise, HIMA cites a portion of her deposition testimony where she states that "had the consultation been answered within 24 hours there would have been no delay." See Docket No. 53 at page 15. After establishing that the timeframe for the consultation was within 24 hours, [5] HIMA concludes that Dr. Crawford's conclusion is factually incorrect.

Upon review of the portion of Dr. Crawford's testimony that plaintiffs cite in their Opposition, we find no such incongruence. The doctor specifically stated that, even though "theoretically" the standard to respond to a consultation is 24 hours, "in a very critical situation, you're supposed to respond as soon as possible." See Docket No. 58-14 at page 51, lines 3-13.

Again, we find that each party points to a limited portion of the testimony that supports their conclusion without accounting for the rest. As such, we are not in a position to make a summary determination at this juncture because we would be appraising the credibility of a particular testimony, a task reserved for the jury.

### (iii) The removal of the catheter

In her report, Dr. Crawford concluded that failure to remove baby K'Marr's infected catheter was one of the reasons why he suffered persistent septicemia and disseminated intravascular coagulation ("DIC"). See Docket No. 53-1 at page 6. Dr. Crawford explained that given K'Marr's condition, "the removal of the infected PICC line was mandatory." Id.

HIMA directs the Court to a fragment of Dr. Crawford's testimony where she agreed to the following statement: "Physicians who are treating a neonate who has documented bacteremia and central venous access (like baby K'Marr) face a difficult decision regarding the removal of the catheter, [as the] catheter often is vital to patient support." See Docket No. 53 at paragraph 32.

Unlike HIMA, we do not see how agreeing to that statement shows a lack of factual controversy as to the hospital's alleged negligence. In her expert report, Dr. Crawford specifically assigned responsibility to the hospital and the physician for K'Marr's death. The plaintiffs' adequately refuted the presumption of reasonableness in medical treatment by adducing sufficient evidence to show both the minimum standard of care required and the defendants' failure to achieve it. It is now up to the jury to

---

[5] The plaintiffs admit that a consultation to an infectious disease consultant was placed on March 23, 2011 at 8:30a.m. and that the consultation had been answered by 8:30a.m. on March 24. See Docket No. 57 at ¶¶28-29.

decide whether ultimately K'Marr died of complications that were a result of being a premature very low weight baby or on account of actions taken by HIMA and its staff.

## V.     CONCLUSION

Faced with material factual controversies as to essential elements of the claims, the Court is precluded from granting summary judgment at this juncture. Thus, HIMA's Motion for Summary Judgment is DENIED.

**IT IS SO ORDERED**.

In San Juan, Puerto Rico, this 3rd day of June, 2014.

S/ JUAN M. PÉREZ-GIMÉNEZ
JUAN M. PEREZ GIMENEZ
UNITED STATES DISTRICT JUDGE